UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**BRIAN MEAD**,                                             Case No. 3:14-CV-01953-KI

                Plaintiff,                         OPINION AND ORDER

    v.

**CAROLYN W. COLVIN,** Acting
Commissioner of Social Security,

             Defendant.


     Robyn M. Rebers
     Robyn M. Rebers, LLC
     P.O. Box 3530
     Wilsonville, OR 97070

          Attorney for Plaintiff


     Billy J. Williams
     Acting United States Attorney
     District of Oregon


Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97201-2902

Gerald J. Hill
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Brian Mead brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

Mead protectively filed applications for DIB and SSI on November 11, 2011.  The

applications were denied initially and upon reconsideration.  After a timely request for a hearing,

Mead, represented by counsel, appeared and testified before an Administrative Law Judge

("ALJ") on June 4, 2013.

On June 12, 2013, the ALJ issued a decision finding Mead not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

October 23, 2014.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.*

*Astrue*, 481 F.3d 742, 746 (9ᵗʰ Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing past work.  If the claimant is able to perform past work, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir.

2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified Mead's severe impairments as lower extremity venous

insufficiency/statis ulcers/pain; status post right ankle fusion with residual pain; obesity;

obstructive sleep apnea; bipolar disorder; and anxiety disorder not otherwise specified. The ALJ

found these impairments, either singly or in combination, did not meet or medically equal the

requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. Given

these severe impairments, the ALJ concluded Mead had the residual functional capacity ("RFC")

to perform the following kind of light work: lift up to 20 pounds occasionally, and lift and carry

up to 10 pounds frequently; stand and walk two hours in an eight-hour day, for up to one hour at

a time; frequently stoop, kneel, and crouch; occasionally climb ramps and stairs, but not ladders,

ropes, or scaffolds; may balance but cannot crawl; occasional exposure to extreme cold,

vibration, and hazards such as moving machinery and unsecured heights; fully capable of

learning, remembering, and performing simple and detailed work tasks, which are performed in a

work environment where there is a regular production pace, few work place changes, and no "over the shoulder" supervision; he may have occasional contact with the public.

Given this RFC, the ALJ opined Mead could not perform his past relevant work, but could perform other work such as mail sorter, price marker, and office helper. Accordingly, the ALJ found Mead not disabled within the meaning of the Social Security Act.

## FACTS

Mead, 36 years old on the onset date of his alleged disability, has a GED, is an ASE certified mechanic, and received basic EMT training. Past work includes garbage truck driver, tow truck driver, and delivery driver. He worked as a garbage man for Western Oregon Waste–his last job of any consequence–from 2007 until he was laid off due to lack of work in 2009. He attempted working for a moving company in 2010, but quit after one week when he realized he could not keep up with the physical demands of the work due to his leg condition.

When he was a child, as a result of an infection, Mead developed deep vein thrombophlebitis involving the femoral vein. He has chronic problems of venous stasis with varicosities and marked dependent edema; he reports he has "always had a left lower extremity that is significantly more swollen than his right." Tr. 270. He develops ulcers on the left ankle. In 2008, before his onset date of disability, the Willamette Valley Medical Center treated one of his ulcers by debridement, and application of Mupirocin ointment, Promogran wound dressing, and a compression wrap. The medical providers strongly recommended compression stockings after commenting on the significant swelling of Mead's left leg.

Medical providers at Virginia Garcia Clinic began treating Mead's mental health impairments and his right ankle pain in November 2010. An x-ray of his right foot in February

2011 revealed "blunting and deformity of right second, third and fourth metatarsal heads with minor deformity of the fifth metatarsal head also likely present." Tr. 266. In addition, the x-ray indicated right ankle joint fusion post surgical findings, and mild talonavicular degenerative arthrosis. To treat his pain, Mead reported taking ibuprofen, Vicodin on and off in the past, and marijuana once a week. Tr. 338, 335. He first shared his concern about left leg pain and edema in April 2011. He was referred to a vascular surgeon, as well as a behavioral health interventionist to improve pain and mood management.

John Wiest, M.D., examined Mead in April 2011. The doctor informed Mead he was not a good surgical candidate. Instead, Dr. Wiest referred Mead for a lymphedema massage.

Bridget Corsetti, PT, treated Mead over three sessions in May. She instructed Mead in how to manually drain his lymph nodes, how to self-wrap, and exercise at home. She also gave him information about caring for his skin. He reported pain at a level 5, and noted a history of pain with bandaging or aggressive edema management. Corsetti commented on Mead's unusual varicosities up into his thigh. Mead's condition responded to "significant elevation and compression[.]" Tr. 309. Corsetti recommended Mead "avoid prolonged standing or sedentary sitting as his leg pools venous blood surprisingly quick." *Id.*

The behaviorist recorded Mead's history of unstable mood and bipolar disorder. Depakote and Zoloft help to stabilize him. Mead indicated a desire to obtain a medical marijuana card in April 2011. He was trying to lose weight and was exercising more; he reported feeling angry.

Mike Schiferl, M.D., treated Mead in July 2011, noting he was in no apparent distress, had normal extremities–including no deformities, edema, or skin discoloration–and no rashes or

lesions.  Mead showed 2+ edema at the left knee and below, but he had good sensation and full

range of motion.  In September, the doctor reviewed Dr. Wiest's report and diagnosed "left leg

edema and chronic congestion and swelling with traumatic and congenital abnormalities[.]"  Tr.

321.  The doctor observed "left leg edema with some varicosities and some areas of brawny

coloring" as well as a healed ulcer on the left ankle.  Tr. 322.  Dr. Schiferl prescribed

Hydrocodone-acetaminophen once daily.

Four months later, Mead returned to Dr. Schiferl, who observed Mead was using the

compression stocking "with good effect."  Tr. 471.  Mead was struggling to heal an ulcer on his

left ankle, but it had not opened.  Mead also reported pain in his feet and knees.  Dr. Schiferl

observed edema on the left from the knee down at 1+.  The left ankle had "multiple surface veins

engorged slightly" and the left knee was "slightly engorged 1x1 cm swelling on medial left

thigh."  Tr. 471.  Dr. Schiferl completed a DMV certification.

Raymond P. Nolan, M.D., Ph.D., examined Mead at the request of Disability

Determination Services.  Mead informed Dr. Nolan that he elevated his leg "periodically."  Tr.

445.  Mead denied use of street drugs.  Dr. Nolan observed "a substantial difference in size

between the right and left leg with obvious varicosities involving the left leg, positive pretibial

edema and scars from prior stasis ulcers."  Tr. 446.  Dr. Nolan also observed Mead able to

change from sitting to standing without trouble, although his gait was abnormal.  Mead did not

use his cane during the examination.  Dr. Nolan opined Mead would have "ongoing problems of

left lower extremities swelling, partially mitigated by a compression stocking."  Tr. 446.  Dr.

Nolan thought Mead could stand and/or walk less than two hours in an eight hour day, and sit at

least six hours "with opportunities for leg elevation as necessary."  Tr. 447.  Mead could lift and

carry 10 pounds on a frequent basis and 30 pounds occasionally.  He could not carry anything

heavier than 30 pounds.

Mead resumed mental health care again in April 2012.  Depakote stabilized his moods.

At a follow up with Dr. Schiferl in May 2012, Mead complained of swelling and pain in

his left leg most days.  As an alternative to Vicodin, which Mead complained made him

nauseous, Dr. Schiferl prescribed Oxycodone-acetaminophen.  Dr. Schiferl noted Mead felt fine

taking only one to two pills a day and that he often went two to three days without any pain

medication.  Dr. Schiferl found 2+ edema from Mead's mid thigh to ankle.

Mead told Dr. Schiferl in August that he was working with the Department of Human

Services on job searching and training.  He felt he could not sit for more than two hours, and

could not stand for more than one hour.  He needed to frequently change positions and he walked

with a cane.  Upon examination, Dr. Schiferl found swelling in the left leg was better with

compression stockings; Mead reported some pain.  Dr. Schiferl thought Mead could attend

classes and job search with significant limitations.  Dr. Schiferl completed a form opining Mead

was unable to walk/stand for long periods; Mead was limited to sitting from one to three hours.

In September 2012, Mead told Dr. Schiferl he felt achy when walking on the swollen leg.

Mead reported it swelled two to three times a week.  The left leg measured 2+ edema from the

thigh down.  There was no redness, nodular areas, or skin changes.

Mead's left leg was painful at the site of a small cyst and his varicosities were engorged

at his last appointment with Dr. Schiferl in January 2013.  His skin color, texture and turgor were

normal.

At a follow-up with Dr. Wiest, Mead reported continued swelling in the left leg despite the use of compression stockings.  "[C]onservative management" had improved inflammation of a varicose vein in the middle of his left thigh.  Dr. Wiest noted:

> significant edema in the entire left lower extremity with prominent varicosities on the medial aspect of the left thigh and medial and lateral aspects of the left calf. There is a prominent obviously thrombosed varix on the medial aspect of the left thigh which is minimally tender.  There is no surrounding erythema.

Tr. 527.  The doctor recommended continued compression and "[p]eriodic leg elevation," as well as considering the use of a lymphedema pump to help swelling and pain.  Tr. 528.

## DISCUSSION

Mead challenges the ALJ's treatment of the medical opinions as well as the ALJ's decision finding Mead's testimony not entirely credible.

I.    Opinion Evidence

There are five opinions in the record relevant to Mead's functional limitations–two treating physicians, an examining physician, a non-examining physician, and an "other source" opinion.

A.    Medical Opinions

Mead disputes that the ALJ properly rejected those examining and treating source opinions which support more limitations than the ALJ included in the RFC.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2. Mead agrees the ALJ was required to give specific and legitimate reasons to reject the more protective functional limitations identified by Dr. Nolan and Dr. Schiferl, and to reject Dr. Wiest's directive.

### 1.    Dr. Nolan

The ALJ gave "some weight" to the opinion of Dr. Nolan, an examining physician. The ALJ rejected Dr. Nolan's opinion that Mead should stand and/or walk *less* than two hours in an eight-hour day, and sit at least six of eight hours with license to elevate his leg as needed. Instead, the ALJ concluded a limit to one hour of standing/walking at a time for a total of two hours would meet Mead's postural needs, and the ALJ rejected the leg elevation limitation "in light of the brief mention of doing so by treating vascular specialist, Dr. Wiest." Tr. 19.

There is no evidence–other than the opinion of nonexamining physician Martin Kehrli, M.D.–to support the ALJ's conclusion Mead may stand and/or walk for a total of two hours. Dr. Nolan's opinion is that Mead is capable of standing/walking *less* than two hours. Dr. Kehrli's opinion is insufficient on its own to overcome the limitations identified by an examining physician. *Widmark*, 454 F.3d at 1066 n.2. The Commissioner contends Dr. Kehrli's two hour

Page 11 - OPINION AND ORDER

standing/walking limitation is consistent with Mead's report that he has difficulty standing for over an hour. Tr. 457. Mead did not identify the total amount of time he can stand in a workday and, as a result, his testimony does not support the ALJ's RFC. Without any other evidence in the record to overcome the limitations identified by Dr. Nolan, the ALJ's standing/walking limitation is not supported by substantial evidence.

More troubling, however, is the lack of support for the ALJ's conclusion that Mead need not elevate his leg. The "brief mention" of Dr. Wiest's to which the ALJ referred only supports Dr. Nolan's opinion; Dr. Wiest recommended Mead periodically elevate his leg. Tr. 528. The ALJ failed to explain how these opinions from an examining and a treating source, which are consistent with each other, support his decision that Mead need not elevate his leg during the workday. *See Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996) ("[T]he similarity of [doctors'] conclusions provides reason to credit the opinions of both."). Dr. Kehrli's opinion does not address whether leg elevation is necessary.

The Commissioner also defends the ALJ's opinion by arguing he gave "some weight" to Dr. Nolan's conclusions because Mead presented himself with a limp and a cane, contrary to the way Mead presented himself to his treating providers. I reject the Commissioner's rationale for a number of reasons. First, the ALJ gave no such reason in his decision. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) (ALJ's decision may not be *post hoc* rationalization). Second, Dr. Nolan commented Mead did not need to use his cane during the examination; thus, implicit in the limitations identified by Dr. Nolan is a recognition Mead need not rely on a cane. Finally, as Mead points out, the Commissioner notes a handful of times when Mead did not present with a cane, but there are other times when he did. *See* Tr. 457, 512. The

Page 12 - OPINION AND ORDER

record evidence is consistent with Mead's testimony at the hearing clarifying he uses his cane to

prolong his ability to stand and walk.  In short, if Mead's presentation to Dr. Nolan were a reason

given by the ALJ, I would not find it to be specific and legitimate.  As a result, I credit Dr.

Nolan's opinion as a matter of law.  *See Lester*, 81 F.3d at 834 (ALJ's failure to provide adequate

reasons for rejecting examining physician entitled to credit as a matter of law); *Luna v. Astrue*,

623 F.3d 1032, 1035 (9th Cir. 2010) (when no outstanding issues to resolve, court may credit

evidence).

> 2.    <u>Dr. Wiest</u>

The ALJ neglected to address Dr. Wiest's opinion, other than in his partial acceptance of

Dr. Nolan's opinion.  Accordingly, the ALJ erred by either failing to address Dr. Wiest's opinion,

or by failing to include a leg elevation limitation in Mead's RFC.

The Commissioner defends the ALJ's failure to discuss Dr. Wiest's opinion, arguing Dr.

Wiest never gave any functional limitations and, in any event, any error was harmless because

the ALJ's RFC is consistent with the conservative treatment Dr. Wiest provided.  I disagree.  The

ALJ failed to address this treating provider's direction for periodic elevation of the leg, whether

phrased as a functional limitation or not.  Although there is no evidence as to what "periodic"

means in the context of a workday, the ALJ should have resolved any ambiguity and discussed

the evidence.  I could not conclude the error was harmless based on a record which includes VE

testimony that elevating a leg more than ten percent of the day would preclude gainful activity.

Tr. 63-64.

3.    Dr. Schiferl

Finally, the ALJ rejected Dr. Schiferl's opinion that Mead was capable of performing only part-time light duty work, that Mead could not walk or stand for long periods, and that he could sit for only one to three hours.  The ALJ concluded the doctor's treatment notes did not support the limitations he gave and instead relied on Mead's subjective complaints.

A physician's opinion of disability may be rejected if it is "based to a large extent on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Further, an ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings."  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Here, it is not clear on what Dr. Schiferl relied to confine Mead to sitting only one to three hours a day, other than Mead's statement to the doctor that he could not sit for more than two hours.  Dr. Schiferl's examination findings are fairly mild over the course of his year-long interaction with Mead.  Mead's left leg never revealed edema greater than 2+ (out of a high of 4+), Mead was going two to three days without pain medication as of May 2012, and Mead's swelling had improved with his use of compression stockings.  Without an explanation from Dr. Schiferl for these postural limitations, the ALJ reasonably concluded from inferences drawn from the record that the doctor relied on Mead's complaints.  Since the ALJ did not err in his credibility assessment, as I discuss below, the ALJ did not err in his analysis of Dr. Schiferl's opinion.

B.     Other Source Opinion

Corsetti is considered an "other source" listed in the Social Security regulations and is not an acceptable medical source. *See* 20 C.F.R. §§ 404.1513(d) and 416.913(d)(1).  The ALJ may reject the opinions of such sources by giving reasons that are "germane" to that source. *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

Corsetti, the physical therapist who assessed Mead's swollen left leg and taught him the mechanics of self manual lymph node drainage, as well as wrapping and home exercises, recommended Mead "avoid prolonged standing or sedentary sitting as his leg pools venous blood surprisingly quick." Tr. 309.  The ALJ simply reported the RFC was consistent with these recommendations.

However, as Mead points out and as the Commissioner concedes, the ALJ failed to include a sitting limitation.  The RFC permits sitting for six hours a day.  If the ALJ intended to reject Corsetti's opinion, he did not provide a germane reason to do so. *See also* SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006) (identifying factors for ALJ to consider in assessing opinions from other medical sources).

The Commissioner argues the ALJ's error is harmless for a number of reasons.  Since I am reversing and remanding this action to the ALJ in any event, I do not express an opinion as to the harmlessness of the error.  The ALJ is instructed to properly address Corsetti's opinion.

II.     Mead's Credibility

Mead challenges the ALJ's credibility analysis.  Mead testified he could not work because of the pain and swelling in his left leg, as well as his bipolar disorder, depression, and fused right ankle.  He explained he needs to elevate his leg dozens of times a day to avoid

swelling.  If his leg swells, an ulceration on his ankle will crack open and it takes months to heal.

He uses a cane to prolong his ability to stand.  He tried working for a moving company, but quit

after a week because it was too hard on his leg.

The ALJ took issue with Mead's testimony as follows:  (1) inconsistent statements; (2)

medical evidence; (3) symptoms responsive to treatment; (4) range of activities; (5) work history;

and (6) criminal charges.  The Commissioner does not defend two additional reasons the ALJ

gave:  Mead's appearance during Dr. Nolan's physical examination, and the waxing and waning

of his mental health symptoms.  The ALJ erred by including the two reasons.  However, the fact

that the ALJ improperly considered some reasons for finding Mead's credibility undermined does

not mean that the ALJ's entire credibility assessment is improper.  *Batson*, 359 F.3d at 1197.

Accordingly, I discuss the other six reasons below.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

General findings are insufficient to support an adverse credibility determination and the ALJ

must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

The Commissioner does not defend the ALJ's assertion that Mead inconsistently reported his reasons for stopping work. As for the other inconsistent statements, I agree with the Commissioner that the ALJ's focus on Mead's testimony about elevating his leg dozens of times a day, when he never reported such frequent lifting to his doctors, was a clear and convincing reason to question Mead's credibility as it indicates a tendency to exaggerate. Although Mead suggests another way to read the record—he argues he never defined the term "periodic" when he spoke with Dr. Nolan and, in any event, his need to elevate his leg differed over the years—the ALJ's interpretation of the record is just as rational. *See Molina,* 674 F.3d at 1110. Other inconsistent statements the ALJ pointed out involved Mead's marijuana use. Mead does not dispute these inconsistencies, but underscores his honesty at the hearing and questions the relevancy of the inconsistency. The ALJ's reading of the record is supported by substantial evidence, and a lack of candor about substance abuse is a clear and convincing reason to question a claimant's credibility. *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999).

The Commissioner points to Mead's treatment records to support the ALJ's conclusion that Mead's symptoms were not nearly as serious as he alleged. Although the ALJ cannot reject

---

[1]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 5, n.2. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

subjective pain testimony solely because it was not fully corroborated by objective medical

evidence, medical evidence is still a relevant factor in determining the severity of the pain and its

disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).  I am not persuaded by

the lack of a prescription for Mead's cane.  Mead never said he was prescribed a cane, and he

was candid about his use of the cane to enable him to walk longer distances.  However, the ALJ's

reading of the treatment records, noting mild edema at 2+, full range of motion, intermittent use

of pain medication, and the fact that Mead appeared in no apparent distress despite his reports of

pain, was reasonable and provided a legitimate ground to question Mead's testimony.  *Batson*,

359 F.3d at 1193 (court may not question ALJ's interpretation so long as supported by inferences

reasonably drawn from the record).

Relatedly, Mead's condition responded to treatment.  Mead did not see Dr. Wiest, the

physician treating his thrombophlebitis, for a period of two years.  When he did, Dr. Wiest noted

swelling in one of Mead's varicose veins in the middle of his thigh had "improved with

conservative management."  Tr. 527.  Dr. Wiest recommended periodic elevation and continued

use of compression stockings.  As the Commissioner asserts, the ALJ reasonably considered

Mead's successful response to treatment in assessing the credibility of his complaints.

The ALJ pointed out Mead was able to work medium-exertion jobs despite his condition,

which he had developed as a child.  *Gregory v. Bowen*, 844 F.2d 664, 667 (9th Cir. 1988)

(claimant's back condition had not prevented her from working).  Mead insists the record

supports a finding that his condition deteriorated over time.  Substantial evidence supports the

ALJ's alternative reading of the record, however.  The 2008 records from Willamette Valley

Medical Center demonstrate Mead struggled with an unhealed ulcer on his ankle, but he never

questioned his ability to work.  He stopped working for Western Oregon Waste because the company laid him off in 2009.  Additionally, providers reported Mead's own recollection of always having more significant edema in his left leg than his right.  Mead did not seek care for left leg edema and pain until April 2011.  Dr. Schiferl noted edema at +1 in January 2012, and otherwise edema remained at +2.  This evidence, together with an alleged onset date of December 1, 2010, constitutes substantial evidence to support the ALJ's concern that Mead stopped working for a reason other than his medical condition.

The Commissioner also defends the ALJ's reference to Mead's incarceration for the kinds of crimes displaying a lack of honesty.  Although I find these criminal actions Mead committed as a teenager only marginally relevant, there is no error in considering them as one factor among many.  *See Hardisty v. Astrue*, 592 F.3d 1072, 1080 (9th Cir. 2010) (ALJ's reliance on criminal convictions in assessing credibility was substantially justified under EAJA).

I am, however, not persuaded that Mead's daily activities–independent personal care, meal preparation, basic household chores, shopping, driving, handling finances, and fishing two to three times a month–are sufficiently inconsistent with Mead's testimony to be relevant to this credibility analysis.  Mead informed his doctor he could not sit more than two hours or stand longer than one hour, and he needed to raise his leg during the day.  None of these activities are inconsistent with this testimony.

All in all, the ALJ properly identified inconsistent statements which suggested Mead exaggerated his symptoms, improvement with treatment, working despite his condition, and engaging in dishonest criminal activity in his youth.  A sufficient number of valid reasons remain

to support the ALJ's credibility decision under this "highly deferential" standard of review. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

III.    Remedy

As Mead points out, hypothetical questions posed to a VE must specify all of the limitations and restrictions of the claimant. *Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001). If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. *Id.* Here, the ALJ failed to account for any sitting limitations, despite purporting to accept Corsetti's opinion. In addition, his allowance for a two-hour walk/stand limitation was not supported by the record. Finally, and most importantly, he failed to provide any evidence for his conclusion that Mead need not elevate his leg during the day, despite treating and examining physicians' opinions to the contrary. Tr. 528 (treating Dr. Wiest directed Mead to periodically elevate his leg); Tr. 447 (examining Dr. Nolan indicated Mead would need to elevate his leg as necessary). Accordingly, the ALJ's RFC is flawed.

To address the errors the ALJ made, the court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Alternatively, the court can remand for

further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

Due to the issues remaining for resolution, I remand this action for further findings of the ALJ. The ALJ must address Corsetti's recommendation that Mead avoid prolonged sitting. Since I have credited Dr. Nolan's opinion as a matter of law, the ALJ must determine whether jobs exist which can be performed when the claimant is limited to standing and/or walking less than two hours in an eight-hour day. Finally, the ALJ must address the uncontradicted medical evidence that Mead must elevate his leg during the day. The ALJ should contact Dr. Wiest and Dr. Nolan to identify the number of times and the length of time Mead must elevate his leg during the workday. If Mead is required to elevate his leg ten percent or more of the time during a workday, the VE's testimony supports a finding of disability. Tr. 63-64.

## CONCLUSION

The decision of the Commissioner is reversed. This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above. Judgment will be entered.

IT IS SO ORDERED.

DATED this ___15th___ day of October, 2015.


 /s/ Garr M. King
Garr M. King
United States District Judge